**UNITED STATES**

v.

**Lieutenant Colonel RICHARD C. ALIS, FR356–48–3185, United States Air Force.**

**ACM 32179.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 15 Dec. 1995.

Decided 30 Jan. 1998.

Appellate Counsel for Appellant: Frank J. Spinner (argued), Lieutenant Colonel Kim L. Sheffield, and Captain W. Craig Mullen.

Appellate Counsel for the United States: Captain Mitchel Neurock (argued), and Major LeEllen Coacher.

Before SNYDER, GAMBOA, and SENANDER, Appellate Military Judges.

## OPINION OF THE COURT

GAMBOA, Judge:

The appellant was convicted by general court-martial, pursuant to his pleas, of fraternization, sodomy, and conduct unbecoming an officer, in violation of Articles 134, 125, and 133, Uniform Code of Military Justice, 10 U.S.C. §§ 934, 925, and 933 (1988), respectively. He was sentenced by members to a dismissal, six months confinement, and forfeiture of all pay and allowances. However, the confinement portion of his sentence was reduced, pursuant to a pretrial agreement, to 30 days. The appellant has assigned seven errors for our consideration. We find no error and affirm.

## I. BACKGROUND

The appellant served as the Staff Judge Advocate (SJA) at Mountain Home Air Force Base (Mt. Home AFB), Idaho, from August 1992 until relieved of his duties in January 1995. Staff Sergeant DM was assigned to the legal office as the administrative discharge clerk. Although the appellant was not Sergeant DM's immediate supervisor, he was in her supervisory chain-of-command and indorsed her enlisted performance reports (EPRs). Sergeant DM sometimes received taskings directly from the appellant and had daily contact with him in the office.

The appellant and Sergeant DM jumped to a new level of familiarity in April 1994 when the appellant asked and Sergeant DM agreed to type some Air War College papers for him. This arrangement often brought the two together during their off-duty hours. The appellant invited Sergeant DM to accompany him to look at a puppy he was interested in buying, and the following weekend he invited Sergeant DM to accompany him to pick up the puppy he had chosen. Afterwards, they stopped for lunch and the appellant bought some items for the puppy. When they returned to the appellant's home, Sergeant DM played with the puppy while the appellant set up its cage. The appellant began to rub Sergeant DM's foot because she

had complained it was hurting. The appellant asked Sergeant DM to stay and play with the puppy, which she did. Later, Sergeant DM was sitting on the floor with the puppy asleep on her lap. The appellant, who was also sitting on the floor, slid across, laid his head on Sergeant DM's lap, and asked, "If I were a puppy, would you pet me?" The appellant kissed Sergeant DM and asked her what she thought about the kiss. She replied that she enjoyed the kiss, but was shocked and surprised that someone like him was interested in her. After talking for several hours, the appellant performed oral sex on Sergeant DM, and they had sexual intercourse. This was the first of several intimate encounters between the appellant and Sergeant DM. The locations for their trysts varied. They had sexual intercourse at the appellant's house, in Sergeant DM's on-base dormitory room, in the appellant's office, and the office library. They also went shopping together at various Idaho locations and took a weekend trip to Sun Valley Idaho Resort as the relationship intensified.

Their flirtatious interaction was noticed by others in the office. Sergeant DM would openly play with the appellant's uniform, remove his battle-dress uniform (BDU) patch and then put it back on again, or touch the back of his neck after haircuts. The two also engaged in an ongoing water pistol fight. Members of the office started talking amongst themselves, and one enlisted member went as far as to confront the appellant with the office gossip and ask if it were true. The appellant denied any personal involvement with Sergeant DM.

Early in their affair, Sergeant DM asked the appellant if their relationship would have any effect on their office. The appellant told Sergeant DM that as long as she didn't allow people to believe that he was giving her favors or treating her better than others in the office, there was nothing wrong with their relationship. In reality, the relationship, which was not well-concealed, had a deleterious effect on the office. Rumors also began circulating as the relationship progressed, and commanders at Mt. Home and even from other bases began to ask questions about the relationship. According to one

judge advocate who worked in the office, the tension was "palpable"—a situation that did not "inspire confidence" in the Mt. Home legal office.

By June 1994, the relationship between the appellant and Sergeant DM began to deteriorate when Sergeant DM discovered that the appellant was living with a female officer, Captain DW. The appellant told Sergeant DM that he was living with the captain for financial convenience and that Sergeant DM was placing more emphasis on it than she should. However, Sergeant DM also found intimate letters from another woman in the appellant's desk. Although they subsequently had sexual intercourse on two other occasions, Sergeant DM maintained that following these discoveries, in her mind, she did not resume a dating relationship with him.

Sergeant DM testified that she found it increasingly difficult to be around the appellant. She claimed they would often argue in his office over their breakup and that he made things "bad" for her at the office. Sometime in early autumn of 1994, Sergeant DM was having a discussion (during which the appellant was present) with an assistant SJA in the office regarding her lack of upper body strength. Sergeant DM said she was unable to do a single push-up. The appellant told her "sure you can," and directed Sergeant DM to do 10 push-ups. Although the conversation began in a joking manner, he persisted when she told him that she was embarrassed and did not want to do the push-ups. Finally, Sergeant DM gave in and asked appellant if she could do them in his office so no one else would see. He agreed. When the two were alone, she again tried to talk him out of making her do the exercise. He insisted and told her she could not leave until she did the push-ups. Eventually, she complied.

Sergeant DM finally reported appellant to authorities a few months later because "he was hurting a lot of people in the office, other people on base [and] there was so much stress, everybody was unhappy." Around that time, Captain DW became pregnant by the appellant and the two were married.

## II. CHALLENGE FOR CAUSE

The appellant argues that the military judge abused his discretion in denying a challenge for cause against a court member, Lieutenant Colonel B, Chief of Environmental Activities at Beale AFB. The appellant contends that Colonel B's prior status as a policeman "coupled with his actions as a commander in sex related cases, clearly raise 'substantial doubt' as to the 'legality, fairness, and impartiality' of the proceeding."

During *voir dire,* Colonel B revealed that he had been an enlisted security policeman from 1965 until 1969 and a civilian police officer from 1970 until 1973. Colonel B related that, as a policeman, he worked in investigations for a year and a half, would "sometimes" encounter false accusations, and had limited experience with sex-crime cases. He reentered the Air Force and spent 16 years as a B–52 pilot. He served as a squadron commander for a year and a half and Deputy Support Group Commander for 3 years. "[F]or six months last year" he served as the Air Force's component commander at Guantanamo Naval Base. In that capacity he "only had Article 15, UCMJ, authority." If more severe action was warranted he would have to ship individuals "home." As a result, Colonel B sent six individuals "home" for "sexual charges of different kinds." Colonel B had not worked in law enforcement since 1973. Colonel B denied that his distant background in law enforcement would influence his decisions at trial.

The defense challenged Colonel B for cause, citing his involvement as a security policemen, as an investigator, and as the commander involved in a variety of sex-crime cases. The military judge denied the challenge for cause, stating that he had observed and listened to Colonel B. He found that there was no reason to disbelieve Colonel B's assertions that he could judge the evidence fairly and impartially.

 A member will be excused for cause when the member should not sit as a member in the interest of having the "court-martial free from substantial doubt as to legality, fairness, and impartiality." MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), RULE FOR COURTS-MARTIAL (R.C.M.)

912(f)(1)(N). The burden of maintaining the challenge is on the challenging party. R.C.M. 912(f)(3). The Court of Appeals for the Armed Forces has consistently recognized that "challenges for cause are to be liberally granted." *United States v. McLaren,* 38 M.J. 112, 118 (C.M.A.1993), *cert. denied,* 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994); *United States v. Glenn,* 25 M.J. 278, 279 (C.M.A.1987). Yet, a ruling on a challenge for cause will not be reversed absent a clear abuse of discretion. *United States v. Hamilton,* 41 M.J. 22, 25 (C.M.A. 1994), *cert. denied,* 513 U.S. 1084, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995). To be invalidated on appeal, the challenged action must be found to be "arbitrary," "clearly unreasonable," or "clearly erroneous." *United States v. Travers,* 25 M.J. 61 (C.M.A.1987).

 An actual bias exists when the member has a personal belief or inelastic attitude that will not yield to the evidence presented and the judge's instructions. *United States v. McGowan,* 7 M.J. 205, 206 (C.M.A.1979). That is certainly not the case here. So we must examine whether an implied bias exists. Implied bias is not viewed through the eyes of the military judge, but through the eyes of the public—would Colonel B's presence on the court panel cause a reasonable, disinterested layman to see unfairness? *United States v. Daulton,* 45 M.J. 212 (1996). When a question of implied bias arises, the military judge's concern must be on the system's appearance of fairness and not only the court member's disclaimer of bias. A military judge should grant a challenge for cause if necessary to preserve the appearance of fairness in the proceedings, even if the judge believes the member would sit impartially. *United States v. Swagger,* 16 M.J. 759 (A.C.M.R.1983).

 Duty as a policeman is not *per se* disqualifying. Excusals on the basis of a member's status as a law enforcement agent are appropriate under certain circumstances; for example, if a member comes a little too close to the action, or is the "embodiment of law enforcement." *United States v. Dale,* 39 M.J. 503, 507 (A.F.C.M.R.1993) (Pearson, J., dissenting), *rev'd,* 42 M.J. 384 (1995). Gener-

ally, where a challenged court-member has minimal contact with the local security police and no prior knowledge of the accusations against an accused, the member's background and training as a security policeman, and even his current assignment in a law enforcement billet, do not raise "substantial doubt" on the "legality, fairness and impartiality" of the proceedings. *Dale,* 42 M.J. at 386; *see United States v. Fulton,* 44 M.J. 100 (1996).

▮ The military judge did not abuse his discretion in rejecting the challenge for cause. Colonel B, whose law enforcement career ended nearly two-and-a-half decades earlier, is hardly the "embodiment of law enforcement." Furthermore, his experiences and actions while a commander were not atypical of that position. Colonel B concluded, and the military judge agreed, that he would be able to judge the case based on the evidence presented and the military judge's instructions. There was no indication that his distant law enforcement past would in anyway affect his ability to fairly and impartially sit as a court member. Nor do we perceive an appearance problem in the eye of disinterested observers. We reject this assignment of error.

## III. RECUSAL OF MILITARY JUDGE

The appellant next argues that the military judge erred by failing to recuse himself after he conducted numerous *ex parte* communications with the trial counsel which he did not disclose to the defense. The appellant asks that his conviction and sentence be set aside.

The appellant's trial was scheduled to begin on 19 September 1995. On 28 August 1995, trial defense counsel sent a memorandum to the military judge requesting relief from the judge's earlier scheduling orders and informing the military judge that the appellant had submitted a resignation in lieu of court-martial (RILO). The memorandum also stated that "the trial counsel is requesting a delay in the trial" pursuant to the Air Force instruction addressing such resignations. Air Force Instruction 36–3207, *Separating Commissioned Officers* (14 July 1993), prohibits the trial from going forward pending action on a RILO unless the Air Force

Legal Services Agency Military Justice Division (AFLSA/JAJM) permits otherwise.

Based upon this information, the military judge contacted the trial counsel and asked if a delay had been filed. Trial counsel, not yet in receipt of trial defense counsel's representation that a delay had been requested answered, "No." The military judge then asked, "Well, are you going to file a request for delay?" and the response from trial counsel was, "I don't know." The military judge then instructed the trial counsel to "decide soon."

The prosecution subsequently requested through the 12th Air Force Staff Judge Advocate (12AF/JA) permission from JAJM to proceed with pretrial motions pending the processing of the resignation request. In their request to proceed to motions, 12AF/JA stated that: "Colonel Pope, the military judge detailed to the case, has no objection to proceeding in this manner." Permission was granted by JAJM on 5 September 1995. The court proceeded with pretrial motions on 19 September 1997.

During the Article 39(a), UCMJ, session, trial defense counsel challenged the impartiality of the military judge and asked for his recusal. Trial defense counsel suggested that the military judge's *ex parte* communications extended well beyond scheduling matters and questioned the military judge about the contact. The military judge responded that he

brought up the idea of doing motions, as a possibility . . . if they wanted to ask for it. I really didn't care if they did it or didn't do it, but we had notice of motions based on a scheduling order, that there were quite a few motions. Many of them motions on matters of law that we could probably take care of ahead of time so I basically asked [trial counsel] . . . "Are you going to request permission to go forward? Are you going to request permission to go forward to only do motions?"

The military judge stated that it was his intent to encourage the government to make a decision because the case created a docketing dilemma; i.e., all parties had blocked off two weeks for the case. He stated that he

did not encourage them to ask for permission to go forward or not ask for permission to go forward, but simply encouraged them to get a decision, which was something "they had to do."

The military judge did not recall telling trial counsel he would be denying trial defense counsel relief from the scheduling orders nor asking trial counsel for a suggestion as to a reasonable deadline for notice of witnesses, as trial defense counsel alleged he had. The military judge denied contacting anyone at 12AF/JA regarding permission to proceed through arraignment or advocating a course of conduct. The trial counsel confirmed that he never heard an opinion from the military judge on this matter which he could have passed along to 12AF/JA. The military judge stated that he had no duty to disclose his contact with the prosecution to the defense because they were all administrative "scheduling things," and stated that he, at no time, suggested to the prosecution that they withhold the docketing information from the defense.

The military judge averred that he did not discover anything about the case pursuant to any *ex parte* contact, nor did he make any decisions or final rulings during his communications with prosecutors. He stated that he had "no hidden agenda" and "no interest in the outcome of the case, other than everyone receiving a fair trial." The military judge found that he was in error in not disclosing a conversation with the assistant trial counsel regarding an appropriate deadline for production of videotapes to the defense. Even though this was a ruling in the defense's favor, he found that he should have given them an opportunity to comment on the date. Nevertheless, the military judge found that this was a timing issue, that there was no demonstrable prejudice to the defense, and that this "neutral" event did not warrant his recusal.

■ The military judge's decision on a recusal motion is reviewed for abuse of discretion. *United States v. Elzy,* 25 M.J. 416 (C.M.A.1988). The disqualification test is to be applied objectively, requiring judges to recuse themselves when their impartiality would reasonably be questioned by an objec-

tive observer. *United States v. Berman,* 28 M.J. 615 (A.F.C.M.R.1989) (*en banc*). The converse is also true; a trial judge has as much obligation not to recuse himself where there is no occasion to do so, as to recuse himself when such occasion exists. *United States v. Reed,* 2 M.J. 972 (A.C.M.R.1976). All *ex parte* communications are not forbidden. *United States v. Chavira,* 25 M.J. 705 (A.C.M.R.1987). When circumstances require, *ex parte* communications for scheduling or administrative purposes that do not deal with substantive issues are authorized provided no party gains a tactical advantage as a result of the communication and the judge makes provision promptly to notify all other parties of the substance of the communication. MODEL CODE OF JUDICIAL CONDUCT, Canon 3 (1990). An *ex parte* communication which gives the appearance of granting undue advantage to one party over the other cannot be condoned. *United States v. Wilkerson,* 1 M.J. 56, 57 n. 1 (C.M.A.1975); indeed, we have cautioned that the appearance of impropriety is to be avoided at all costs. *United States v. Dean,* 13 M.J. 676 (A.F.C.M.R.1982). However, we have held that under certain circumstances "a trial judge's concern for docket management is understandable." *United States v. Brauchler,* 15 M.J. 755, 758 n. 3 (A.F.C.M.R.1983); accord *United States v. Foley,* 37 M.J. 822 (A.F.C.M.R.1993). The facts of the present case give us no reason to depart from this position.

■ We agree with the military judge's candid appraisal of his own performance; i.e., that the situation could have been handled better. However, there is no indication of bias by the military judge in favor of the prosecution or prejudice against the appellant. Our examination of the record satisfies us that the *ex parte* communications were of an administrative nature and that appellant suffered no prejudice from the contact. The military judge did not initiate the communication without reason. The triggering event was the defense's memorandum which represented that the prosecution was requesting or had requested a delay. He contacted prosecutors on the assumption that he was missing a document or an oral request for

delay. It was reasonable for the military judge to attempt to confirm information contained in the defense memorandum which could have affected the docketing and scheduling of upcoming cases. Any suggestion to proceed to an Article 39(a), UCMJ, session was prompted by judicial interest in the motions being resolved at an early date—a conscientious concern for case management rather than advocacy for a course of action. The military judge did not abuse his discretion in refusing to recuse himself. We reject this assignment of error.

## IV. APPELLANT'S VIEWS ON FRATERNIZATION

At the beginning of the sentencing case, the government announced that it would offer the testimony of Sergeant DM and Captain MS, a judge advocate assigned to the Mt. Home AFB legal office, to testify about conversations they had with the appellant. In one of the conversations, the appellant assured Sergeant DM that it was appropriate for them to be dating as long as she didn't ask for special treatment. The second conversation concerned Lieutenant S, an officer stationed at Mt. Home who received a Letter of Reprimand (LOR) for fraternization. According to Sergeant DM, the appellant was pushing Lieutenant S' unit commander to punish the junior officer "more heavily because he said it took away from the Corps ... and as long as he had any say in the matter, [the Lieutenant] would be punished more harshly." Significantly, Sergeant DM would testify that the day before that meeting she had sexual intercourse with the appellant.

Captain MS testified that the appellant instructed him to check on the status of the Lieutenant S case, even though that individual had changed stations. When he asked why he was being asked to do so, the appellant told him, "We have to maintain core values." He also testified that the relationship between the appellant and Sergeant DM caused a "palpable tension" in the office. Also, because other individuals on Mt. Home AFB knew about the relationship, it adversely affected the ability of the office to perform its mission. The military judge allowed the testimony of Sergeant DM and Captain MS over the objection of trial defense counsel, ruling that it was facts and circumstances of the fraternization offense.

The appellant contends that the military judge erred in admitting evidence (specifically through the testimony of Sergeant DM) of his views of the seriousness of fraternization. He argues that the evidence was: (1) not proper aggravation evidence, (2) irrelevant, and (3) impermissible because it relied on his duty position. We note at the outset that since the appellant did not raise the third point at trial, he forfeited it in the absence of plain error. MIL.R.EVID. 103(a)(1), 103(d).

A trial judge's decision to admit or exclude sentencing evidence is reviewed under an abuse of discretion standard. *United States v. Wright*, 20 M.J. 518, 521 (A.C.M.R.), *pet. denied*, 21 M.J. 309 (C.M.A. 1985). Trial counsel is permitted to "present evidence as to any aggravating circumstances directly relating to or resulting from offenses of which the accused has been found guilty." R.C.M. 1001(b)(4). An accused's attitude toward the offense of which he has been convicted is directly related to that offense and relevant to fashioning a sentence appropriate to both the offense and offender. *United States v. Anderson*, 25 M.J. 779, 781 (A.C.M.R.1988). An accused's awareness of the magnitude and seriousness of a crime is admissible in sentencing, as is a remorseless attitude toward the offense committed. *Wright*, 20 M.J. at 520; *United States v. Pooler*, 18 M.J. 832, 833 (A.C.M.R.1984), *pet. denied* 19 M.J. 317 (C.M.A.1985). The relevance of an offender's attitude toward his offense "can hardly be exaggerated." *Pooler*, 18 M.J. at 833. Such evidence is admissible if its probative value is not substantially outweighed by its prejudicial effect. MIL.R.EVID. 403.

We are convinced that this evidence constituted aggravating circumstances directly related to the offenses of which the appellant was convicted. The appellant's misconduct adversely affected his office's mission and reputation. Having determined admissibility, we resolve the MIL.R.EVID. 403 balancing test against the appellant and conclude that the evidence had significant probative

value, which was not outweighed by its prejudicial effect. The military judge did not abuse his discretion. We reject this assignment of error.

## V. APPELLANT'S DUTY STATUS

Trial counsel sought to have the military judge instruct on appellant's duty position as an aggravating offense. The military judge refused, but did permit trial counsel to argue facts and circumstances surrounding the offense. Trial counsel referenced appellant's status as an SJA several times during sentencing argument. Defense counsel did not object to these references at trial, but now argues that the trial counsel's references to the appellant's status as the staff judge advocate, during his sentencing argument, constituted plain error.

■■■ Absent plain error, objections to argument are waived. MIL.R.EVID. 103(d). Arguments in which trial counsel seeks to secure an appropriate sentence by showing the appellant menaced the Air Force because of his or her duty is impermissible, absent evidence that an accused's crimes affected his duty. *United States v. Gruninger*, 30 M.J. 1142, 1143 (A.F.C.M.R.), *pet. denied*, 32 M.J. 15 (C.M.A.1990).

■■■ Here, there is ample evidence that appellant's duty status assisted his relationship with Sergeant DM and that his integrity as the base's chief legal officer was compromised by his misconduct. Confidence waned; rumors reached commanders on and off base who began to question the competency of the legal office and the integrity of the officer in charge. The office functioned in an atmosphere of tension. Furthermore, Sergeant DM, a subordinate in the same office, was told by the appellant that nothing was wrong with their relationship as long as she didn't give people the impression she was receiving special favors. She entered into and continued with the relationship, relying at least in part on the appellant's representations, because of who he was—the SJA. Trial counsel references to the appellant as SJA were properly pulled from the facts and circumstances of the case. We reject this assignment of error.

## VI. IMPEACHMENT: BIAS

Captain MS, who became the acting SJA when the appellant was relieved of his duties, testified during presentencing about the impact of the appellant's misconduct on the legal office. Before Captain MS testified, the defense announced that it would impeach the testimony of Captain MS with extrinsic evidence of bias under MIL.R.EVID. 608(c). Trial counsel moved *in limine* to prevent impeachment of their witness.

Captain MS went on a temporary duty assignment to a military exercise in November 1995, eleven months after the appellant was relieved as SJA. While there, Captain MS was relieved of his duties and sent home because he allegedly gave faulty advice to a squadron commander who, based on that advice, was also relieved of his duties. When Captain MS returned to Mt. Home, the new SJA, Lieutenant Colonel G, placed him in a new duty position so that he could monitor him more closely and limit his contact with commanders who lost confidence in him because of the incident.

The defense counsel requested they be allowed to impeach Captain MS with the extrinsic testimony of Colonel G and to cross-examine Captain MS regarding the incident. The defense contended that Captain MS knew his career was in jeopardy, knew there was considerable command and judge advocate interest in appellant's case, which gave Captain MS a motive to "embellish and fabricate his testimony in a manner that was favorable to the government" and thereby presumably help his own situation. The prosecution countered with statements Captain MS made to Air Force Office of Special Investigation agents before he went on temporary duty, illustrating that his account of the appellant's negative impact on the legal office had remained consistent.

The military judge concluded that there was "no viable basis" to believe that Captain MS had a motive to lie and that this argument would be "totally confusing to the members." Accordingly, he allowed Captain MS to testify during sentencing about the negative effect appellant's misconduct had on the office and its ability to accomplish its mis-

sion. The appellant now argues that the military judge erred in excluding evidence of Captain MS's potential bias and motive to fabricate.

■■■■ A witness may be impeached by evidence of "bias, prejudice, or any motive to misrepresent." MIL.R.EVID. 608(c). The purpose of impeachment is to flush out any hostility or partiality of the witness from which one can infer the witness' testimony is distorted. *United States v. Banker*, 15 M.J. 207, 210 (C.M.A.1983). Although extrinsic evidence of bias may be introduced, the theory of bias that supports the introduction of the evidence may not be so tenuous as to be collateral. *United States v. Jones*, 30 M.J. 898, 899–900 (A.F.C.M.R.1990). A military judge's decision to admit or exclude evidence of bias, prejudice or motive to misrepresent is reviewed for an abuse of discretion. *United States v. Gray*, 40 M.J. 77, 80 (C.M.A. 1994). A military judge has "wide discretion" when balancing between the probative value and prejudice of the evidence. *United States v. Rust*, 41 M.J. 472, 478 (1995), *cert. denied*, 516 U.S. 861, 116 S.Ct. 170, 133 L.Ed.2d 112 (1995).

■■■ Captain MS's career problems did not affect his testimony against the appellant and were irrelevant. The incident occurred well after the appellant was removed from his position as SJA; trial defense counsel even admitted that Captain MS's TDY experience had nothing to do with the appellant. Moreover, Capt MS made statements about the effect of appellant's misconduct on the office before the alleged motive to fabricate arose. There was no evidence of bias, prejudice or a motive to misrepresent. The military judge was correct in his assessment that the evidence would be "totally confusing" to the members. He did not abuse his wide discretion. We reject this assignment of error.

## VII. STAFF JUDGE ADVOCATE RECOMMENDATION

The appellant next argues that a new convening authority action and a new Staff Judge Advocate's Recommendation (SJAR) is required because the SJAR misrepresented the court's findings. The appellant pled guilty to Charge I, Specification 1 (fraternization with Staff Sergeant DM), except the words "enticing [Sergeant DM] to secure an early voluntary separation from the Air Force to facilitate their marriage." Pursuant to the pretrial agreement, trial counsel did not litigate the excepted language and the military judge found the appellant guilty in accordance with his pleas. The appellant was acquitted of the charges that were litigated before members. The SJAR, Report of Trial (AF Form 1359) and General Court–Martial Order incorrectly set forth the findings of the military judge, making it appear that the appellant was convicted of the specification as alleged, not by exceptions and substitutions. It is undisputed that this was error; however, the effect of the error is controverted.

In reviewing claims of misleading or improper SJAR's, this Court has held that "there must not only be error, there must also be prejudice to the rights of the accused." *United States v. Blodgett*, 20 M.J. 756, 758 (A.F.C.M.R.1985). The appellant contends that the error was prejudicial as it misrepresented the findings of the court and thereby misled the convening authority. He asks that the record be returned for a new SJAR and new action by the convening authority. The government points out that no objection was lodged to any matter contained in the SJAR, and therefore the matter is forfeited, absent plain error. R.C.M. 1106(d)(6).

■■■■ The convening authority uses the SJAR and accompanying documents as an aid in determining what action to take on sentence; therefore, the SJA must provide correct information to the convening authority in these documents. *See United States v. Kerwin*, 46 M.J. 588 (A.F.Ct.Crim.App.1996). Whether or not an appellant was prejudiced by a mistake in the SJAR generally requires a court to consider whether the convening authority plausibly might have taken more favorable action had he or she been provided accurate or more complete information. *United States v. Johnson*, 26 M.J. 686, 689 (A.C.M.R.), *aff'd*, 28 M.J. 452 (C.M.A.1989).

■ We find that there is error; however, the appellant was not prejudiced. The convening authority was aware that the appellant would plead guilty by exceptions and substitutions; he approved a pretrial agreement that required trial counsel not to proceed with the excepted language. Furthermore, the addendum to the SJAR informed the convening authority that the pretrial agreement was still in effect. Appellant has not demonstrated that any of his substantial rights were affected by the error. We order corrective action to the general court-martial order.

## VIII. SENTENCE APPROPRIATENESS

The appellant argues that his sentence is inappropriately severe and that his record of lengthy and outstanding service justifies the mitigation of his dismissal to a fine. The appellant was not retirement eligible at the time of trial, but had served approximately 19 and 1/2 years.

■ Sentence appropriateness involves the "judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A.1988). An appropriate sentence is fashioned by individualized consideration of the particular appellant, weighing the nature and seriousness of the offense, the character and military performance of the appellant, and all circumstances contained in the record of trial. *United States v. Snelling*, 14 M.J. 267 (C.M.A.1982). There is no question that a dismissal for an officer is a serious punishment "in that it expels the offender with disgrace" from the service. *United States v. Ohrt*, 28 M.J. 301, 306 (C.M.A.1989) (quoting W. Winthrop, *Military Law and Precedents* 433 (2d ed. 1920 Reprint) (footnotes omitted)). We decline to find a dismissal an inappropriately severe punishment in this case, where an officer virtually abandons his position of trust and responsibility for an affair with a subordinate, and encourages the subordinate to continue the relationship when questioned about its legality.

The appellant argues that the government failed to "connect the dots" which tie the appellant's offense to a discernable impact on the legal office mission. We disagree. The appellant initiated and maintained a personal sexual relationship with a subordinate in the base legal office. The subordinate worked under his authority and he signed her EPR's as indorser. Some of their rendezvous took place in the legal office, and even though their more intimate encounters took place behind closed doors, their playfulness betrayed the actual extent of their involvement to members of the office who observed their interaction on a daily basis. Rumors stretched beyond the walls of the legal office to other offices on and off base. The reputation of the legal office suffered under the scrutiny.

The appellant also urges us to compare his situation to that of a general officer who was given Article 15, UCMJ, punishment and allowed to retire after having an affair with a civilian woman. We are unpersuaded by such comparisons. *See United States v. Snodgrass*, 37 M.J. 844 (A.F.C.M.R.1993) (sentence appropriateness is based on the individual circumstances of the case, with regard to both the offense and the offender). Few offenses are as deleterious to an organization's morale and discipline as those committed by the appellant. The approved sentence is not inappropriately severe. We reject this assigned error.

## IX. CONCLUSION

We order that the general court-martial order be administratively corrected. The findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Accordingly, the findings and sentence are

AFFIRMED.

Senior Judge SNYDER and Judge SENANDER concur.