# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

―――――――――――

**No. ACM 40439**

―――――――――――

**UNITED STATES**
*Appellee*

**v.**

**William C.S. HENNESSY**
Airman First Class (E-3), U.S. Air Force, *Appellant*

―――――――――――

Appeal from the United States Air Force Trial Judiciary

Decided 25 November 2024

―――――――――――

*Military Judge*: Sterling C. Pendleton.

*Sentence*: Sentence adjudged 9 February 2022 by GCM convened at Spangdahlem Air Base, Germany. Sentence entered by military judge on 4 March 2022: Dishonorable discharge, confinement for 34 months, reduction to E-1, and a reprimand.

*For Appellant*: Major Heather M. Bruha, USAF; Philip D. Cave, Esquire.

*For Appellee*: Colonel Zachary T. Eytalis, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Major Jocelyn Q. Wright, USAF; Major Lecia E. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, MASON, and WARREN, *Appellate Military Judges*.

Judge MASON delivered the opinion of the court, in which Chief Judge JOHNSON joined. Judge WARREN filed a separate opinion, concurring in part and dissenting in part.

―――――――――――

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

―――――――――――

MASON, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault upon KE, and two specifications of abusive sexual contact, one each upon KG and IE, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for 34 months, reduction to the grade of E-1, and a reprimand. Appellant requested that the convening authority defer the adjudged reduction in rank until action as well as the automatic forfeitures until entry of judgment. The convening authority denied Appellant's deferment requests, took no action on the findings, and approved the sentence in its entirety.

Appellant raises six issues on appeal, which we have re-ordered and consolidated: (1) whether the military judge abused his discretion in denying a challenge for cause to SG, a prospective panel member, for implied bias; (2) whether Appellant's Due Process rights were violated because he was convicted of a theory of criminality not on the charge sheet; (3) whether the conviction for sexual assault is legally and factually insufficient; (4) whether trial counsel's findings argument was improper; (5) whether Appellant was denied his right to a unanimous verdict; and (6) whether the post-trial processing delay should result in dismissal.[2]

On 20 August 2024, we issued our opinion in this case. *United States v. Hennessy*, No. ACM 40439, 2024 CCA LEXIS 343 (A.F. Ct. Crim. App. 20 Aug. 2024) (unpub. op.). We affirmed the findings and modified the sentence due to excessive post-trial delay in the docketing of the case with the court. *Id.* at *41. On 19 September 2024, Appellant moved for this court to reconsider its decision. The Government opposed the motion on 24 September 2024. On 30 September 2024, the court denied said motion.

On 7 October 2024, the United States Court of Appeals for the Armed Forces (CAAF) issued their opinion in *United States v. Mendoza*, __ M.J. __, No. 23-0210, 2024 CAAF LEXIS 590 (C.A.A.F. 7 Oct. 2024). On 9 October 2024, we *sua sponte* reconsidered our denial of Appellant's Motion for Reconsideration and vacated our original opinion in this case. *See United States v.*

---

[1] Reference to the Article 120, UCMJ, offense involving KG (Specification 1) is to the *Manual for Courts-Martial, United States* (2016 ed.). References to the Article 120, UCMJ, offenses involving KE (Specification 2) and IE (Specification 3) are to the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*). Unless otherwise noted, all other references to the UCMJ, Military Rules of Evidence (Mil. R. Evid.), and Rules for Courts-Martial are to the 2019 *MCM*.

[2] Appellant raises issue (1) and part of issue (4) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

*Hennessy*, No. ACM 40439, 2024 CCA LEXIS 494 (A.F. Ct. Crim. App. 9 Oct. 2024) (order).

We have carefully considered issue (5) above and find it does not require discussion or relief. *See United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023).

Upon reconsideration and in light of *Mendoza*, we find Appellant's conviction for sexual assault of KE (Specification 2 of the Charge) factually insufficient. As a result, issues (2) and (4) are moot.[3] We have carefully considered but decline to address issue (6) related to the Government's excessive post-trial delay in docketing the case, at this time. We affirm the remaining findings and authorize a sentencing rehearing in our decretal paragraph.

## I. BACKGROUND

In March 2018, Appellant was stationed at Spangdahlem Air Base (AB), Germany. Around that time, Appellant met an Airman in the dorm, KG. They saw each other in passing a few times and became friends. They exchanged messages on social media. At some point, Appellant and KG decided to hang out in KG's room. The plan was to watch videos and funny Internet pictures. When Appellant arrived at KG's room, he immediately lay down on her bed. KG sat down next to him and they started watching videos. Appellant leaned in and inched closer to her. KG leaned away. Appellant touched KG's buttocks and his hand came to a rest on her thigh. KG paused the video and stood up, telling Appellant that their "time in the room was done" or words to that effect and Appellant left.

In March 2019, KE arrived on station at Spangdahlem AB. A few months after her arrival, KE received a direct message from Appellant telling her that they had "matched" on a dating website. KE responded to the message and the two continued to exchange messages on multiple social media platforms over the next few days. About a week after their initial online interaction, they made plans to meet in person. Appellant invited KE to his dorm room and KE agreed to meet him there.

Around 1500 to 1600 on 8 June 2019, KE went to Appellant's dorm room. They both sat on Appellant's couch and watched a show. Appellant inched closer to KE. Appellant reached to hold KE's hand. KE felt like Appellant was moving too quickly as they had just met. When Appellant leaned in as if to kiss her, KE pulled away. A few minutes later, Appellant again leaned in as if to

---

[3] In issue (4), Appellant alleges trial counsel presented improper arguments pertaining to the sexual assault allegation. With the court's decision to reverse and dismiss with prejudice this conviction, no discussion is warranted.

kiss her. This time, he used one hand to grab her face and kissed her on the lips. KE again pulled away. Appellant said, "I'm sorry. I know I'm super affectionate." After the kiss, KE stayed in Appellant's dorm room for a little under a half hour before she left.

When KE was back in her room, Appellant sent her a message that said, "Hey, I'm sorry if I was moving too fast. I'd like it if we could start over and meet up later tonight for the concert." Feeling better after Appellant's apology, KE went to a concert at the club on base that night with Appellant. They had talked about the concert earlier because KE wanted to go and her friends were not available. KE arrived at the concert and saw Appellant sitting with his friends. She approached them, sat down, and watched the concert. Towards the end of the evening, while they were still at the club, Appellant asked KE, "So my room or yours?" KE responded, "You go to yours and I'll go to mine." Appellant stated, "Okay."

During the evening, and still at the club, KE received a call from her brother. While KE was on the call, Appellant approached her and started rubbing her back. KE nudged it off, Appellant stopped, and KE continued her conversation.

At the end of the evening, KE was feeling "drunk or buzzed." She described her experience with alcohol prior to arriving on station as "none." That night, KE drank multiple alcoholic drinks. Appellant offered to give KE a "piggyback ride." KE, tired and drunk, agreed. The next thing KE remembered after getting on Appellant's back is waking up in Appellant's room with Appellant inside of KE having sex with her. KE opened her eyes and saw Appellant's penis inside of her. KE did not know how they got to that point but decided to pretend that she was asleep to get Appellant to stop. She closed her eyes and turned her head. Appellant called her name and said, "Oh, no." He shook her shoulder to get her to wake up or open her eyes. Appellant then stopped penetrating KE, got up, and walked away. After Appellant stepped out, KE got up and started gathering her things. She told Appellant that she needed to go and that her friend needed her. Appellant responded by asking KE to stay. He offered KE the option of staying on the bed and he would sleep on the couch. KE declined saying that her friend really needed her. When she was dressed and had her things, KE left. She proceeded down to the ground level of the dorm building and ran to her dorm room.

Upon arrival at her room, KE cried and unsuccessfully tried to reach out to one of her friends, SL. However, she was able to reach another friend, KB. She met KB outside the dorm building and told him what had happened to her. Not long after meeting with KB, KE was able to contact SL. Within about 15 minutes of the phone call, SL met KE outside the dorm room. The two of them proceeded up to KE's room. KE was crying and wanted a female to help her.

The same evening, KE reported to the Sexual Assault Response Coordinator what had happened. They told KE about the possibility of completing a "sexual assault kit." KE agreed to have a forensic medical examination. During this examination, DNA samples were collected. DNA collected from KE's cervical swab matched Appellant.

On 4 July 2019, IE, a German national, was living in a town near Spangdahlem AB. IE and her friends were planning on coming to the base to watch the fireworks. IE had previously met Appellant. They met in late 2018 or early 2019 at a club and had seen each other at a bar on another occasion. On the night they met, they "made out." On the second occasion, they had "a short kiss." Between their meeting and 4 July 2019, they had exchanged a few messages and IE would occasionally see Appellant from afar when she was out with her friends at an Irish pub. Occasionally, Appellant would invite IE to come hang out on base. IE declined those offers because she did not want to go into his dorm and generally preferred to meet people in public places. Every time she offered to meet in town, Appellant declined those invitations.

At the time, IE's friend was dating an Airman at Spangdahlem AB, and IE agreed to go with them to a Fourth of July celebration on base. IE and her friend arrived on base around 1800 or 1900 on 4 July 2019. While there, IE saw Appellant and talked with him. At one point in the evening, Appellant and IE walked to Appellant's dorm building because Appellant stated that he needed to get something from his room. Once they arrived, Appellant repeatedly asked IE if she wanted to come into his dorm room. IE responded in the negative and waited outside the room. Appellant came out of his room and the two of them went their separate ways—IE returned to her friends and Appellant walked away.

IE and her friends were still hanging out and drinking later that evening when Appellant returned. IE went into a women's restroom and Appellant followed her there, prompting IE to ask him to get out of the restroom. Appellant hesitated, then heard people coming and left. IE returned to watch the fireworks.

Later, Appellant returned again, and the two talked for about 15–20 minutes. He asked IE if she wanted to go to a quiet place. They agreed to go to the theater room inside the dorm building where they sat down and talked. Appellant used his hand to pull IE's face towards him. IE turned her head away and pushed him away from her. This happened two to three times. During this exchange, Appellant repeatedly placed his hand on her buttocks. Each time, IE pushed Appellant away and told him to stop or she was going to leave. Appellant apologized and said that he would stop. A few minutes later, Appellant tried to kiss IE. He then pulled down his pants and again put his hands on her buttocks. IE could see that Appellant had an erection. Appellant tried to put

IE's hand in "that area." IE did not want "to do that," so she left. She heard Appellant say that IE "can't just leave him like that."

## II. DISCUSSION

### A. Challenge for Cause to SG

#### 1. Additional Background

For his forum selection, Appellant elected a panel consisting of officers and enlisted members. One of the detailed members was SG. During general voir dire, SG indicated that she might know one of the witnesses. She also indicated that a member of her family or someone close to her had been a victim of a similar offense to the one charged in this case. She indicated that she knew a friend, family member, neighbor, coworker, or member of her unit that had been accused or convicted of a similar offense to one charged in this case. She responded affirmatively to a question asking if she had been told that a person cannot consent to sexual activity if they had consumed any amount of alcohol.

Following general voir dire, multiple members were recalled for individual voir dire, including SG. She was questioned further about her initial answers. She stated that her cousin had been raped while growing up and that her sister-in-law and wife had both been molested by their fathers while growing up. She also stated that she knew a former coworker who had been molested by a different coworker at one time.

Regarding the coworker, SG stated it had happened before SG's time but it came up in a conversation. She stated that she was told by her coworker that her assailant, a prior coworker, entered her shower and "molested" her. That was the extent of SG's knowledge of what happened.

With regards to her cousin, SG did not know by whom the cousin was raped. She knew that it was someone in the family, but it was kept "hush hush" by the family. SG did not interact often with her cousin describing it as "[m]aybe a text here and there, like, in a year kind of thing."

SG was also asked about her knowledge of the circumstances regarding her wife and sister-in-law being molested as children by their father. SG had next to no knowledge about her sister-in-law's situation. Regarding her wife, SG learned about the molestation while she and her now-wife were dating. SG stated that this disclosure brought the two of them closer together. She had discussed this situation at times with her wife "when she [brought] it up." On those occasions, SG's wife becomes emotional. SG's response is to hold her and listen because she "can't really relate."

SG was asked about who told her that a person cannot consent to sexual activity if they had consumed any amount of alcohol. She stated that she heard

that in a briefing from the sexual assault prevention and response training. The military judge asked her if she could follow his instructions and "put that out of [her] head." Without hesitation, SG indicated that she could.

When asked which witness she knew, SG stated that it was OC.[4] She stated that she knew him professionally only, would interact with him once per year, and that if he did testify, she would not give his testimony more or less weight than others simply because she knew him and interacted with him previously.

SG was also asked about the person she knew who was accused of committing a similar offense. She stated that it was a prior coworker who was accused of sexually assaulting another Airman. She stated that she had moved to another duty station when this happened but heard about it. Before she moved, she was close to the accused Airman, but did not remain in contact afterwards. She was not involved in the case at all.

The military judge noted SG's demeanor while being questioned and described it as reserved, noting that SG did not seem upset. Rather, he found her to be "sort of middle of the road the whole conversation to me."

**2. Law**

A military judge's determination that a member does not have actual bias is reviewed by this court for abuse of discretion. *United States v. Keago*, 84 M.J. 367, 372 (C.A.A.F. 9 May 2024) (citing *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020)). The test for actual bias is whether a member's personal bias "will . . . yield to the military judge's instructions and the evidence presented at trial.*"Id.* (ellipses in original) (quoting *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012)).

When reviewing a military judge's determination on implied bias, we apply a standard of review "that is less deferential than abuse of discretion, but more deferential than de novo review." *Id.* (citing *United States v. Peters*, 74 M.J. 31, 33 (C.A.A.F. 2015)). The test for implied bias is "'whether the risk that the public will perceive that the accused received something less than a court of fair, impartial members is too high.'" *Keago* (quoting *United States v. Woods*, 74 M.J. 238, 243–44 (C.A.A.F. 2015)).

In *Keago*, our superior court explained,

> We interpret our case law as dictating a sliding standard of appellate review for implied bias challenges that falls somewhere on a spectrum between de novo and abuse of discretion based on the specific facts of the case. A military judge who cites the

---

[4] OC was a commander's support staff superintendent. OC testified during the trial that KE told him that she had been assaulted and by whom.

correct law and explains his implied bias reasoning on the record will receive greater deference (closer to the abuse of discretion standard), while a military judge who fails to do so will receive less deference (closer to the de novo standard). Accordingly, the more reasoning military judges provide, the more deference they will receive.

*Id.* at 373 (citing *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016)).

"[I]n close cases [of implied bias,] military judges are enjoined to liberally grant challenges for cause" from the Defense. *Id.* at 373 (emphasis omitted) (quoting *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007)). In other words, "military judges retain their discretion to determine whether a challenge for cause constitutes a 'close case' of bias. However, when a case is close, the liberal grant mandate prohibits military judges from denying the challenge." *Id.* at 373 (footnote omitted).

### 3. Analysis

Reviewing the military judge's ruling on the Defense's challenge for cause to SG as well as the six other challenges for cause, the military judge meticulously articulated the applicable law regarding actual bias and implied bias. Further, he repeatedly noted the applicability of the liberal grant mandate to defense challenges for cause, and specifically articulated his awareness that in close cases military judges were required to apply the liberal grant mandate to implied bias challenges. Moreover, he provided a detailed analysis on the record substantiating his ruling on the denial of the challenge for cause to SG. Under these circumstances, our standard of review moves significantly closer to abuse of discretion. *Cf. Rogers*, 75 M.J. at 273 ("As the military judge did not perform an implied bias analysis on the record, our review of her analysis will move toward a de novo standard of review.").

Appellant personally asserts that the military judge erred by denying the challenge for cause to SG. He argues that the military judge did not sufficiently consider or apply the liberal grant mandate and that he did not state whether this was a close call. We disagree.

SG's challenge for cause was the last in a line of seven defense challenges for cause. Review of the rulings on these reveals that the military judge fully understood the law and applied it correctly. In making his rulings, he repeatedly referenced the liberal grant mandate, and it is apparent that he considered it before ruling on the challenges.

It is arguable that SG's status as a spouse of a victim of a sexual offense alone raises the specter of implied bias. However, our superior court has made clear that such a status alone is not per se disqualifying. *See United States v. Terry*, 64 M.J. 295, 297 (C.A.A.F. 2007) ("[A] prior connection to a crime similar

to the one being tried before the court-martial is not per se disqualifying to a member's service."). In fact, the court impliedly reiterated this holding very recently. In *Keago*, the CAAF granted review to determine whether the military judge erred in denying challenges for cause against three prospective panel members. 84 M.J. at 370. The CAAF found error in the military judge not excusing two members for cause. *Id.* at 374. The third member challenged was a spouse of a victim of sexual assault. *Id.* at 371. The CAAF did not articulate whether it found error in the military judge's denial of the challenge for cause to this member. *Id.* at 374 ("[S]everal factors lead us to conclude that the *two* challenged members presented a close case of implied bias." (emphasis added)).

Here, the military judge was satisfied based on SG's in-court responses that she did not demonstrate actual bias or implied bias. Specifically, he ruled, "I don't think an outsider looking into this system would have a substantial doubt as to her impartiality or have a question about the fairness of the system with regard to her sitting on the panel." As we apply a standard closer to abuse of discretion, we note that his findings of fact were not clearly erroneous, and his application of the law was not "arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[5] *See United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (citation omitted) (holding that "[t]he abuse of discretion standard is a strict one, calling for more than a mere difference of opinion"). Based on our analysis, we find the military judge did not err by denying the defense challenge for cause to SG.

## B. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his sexual assault conviction under Specification 2 of the Charge involving KE.

### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States*

---

[5] Notably, the military judge did grant a defense challenge for cause against another member who had asserted that his spouse had been sexually assaulted, illustrating the military judge's understanding of the applicable law as well as the careful consideration given to each member's individual responses and circumstances.

*v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

Appellant was convicted of sexual assault without consent, in violation of Article 120, UCMJ, which required the Government to prove the following elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon KE by penetrating her vulva with his penis; and (2) that Appellant did so without KE's consent. *Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 60.b.(2)(d).

A charge of sexual assault without consent is a separate theory of liability from a charge of sexual assault upon a person incapable of consenting. *Mendoza*, 2024 CAAF LEXIS 590, at *17. A charge of sexual assault without consent alleges criminal conduct "upon a victim who is capable of consenting but does not consent." *Id.* A charge of sexual assault upon a person incapable of consenting alleges criminal conduct "upon a victim who is incapable of consenting to the sexual act due to impairment by any drug, intoxicant, or other similar substance when the victim's condition is known or reasonably should be known by the accused." *Id.* at *17–18.

In "without consent" cases, evidence of a victim's level of intoxication may be relevant and admissible, *id.* at \*22; however, it is improper to use this evidence "as proof of [a victim's] inability to consent and therefore proof of absence of consent" in these cases. *Id.* In other words, what "the Government cannot do is prove the absence of consent under Article 120(b)(2)(A), UCMJ, by merely establishing that the victim was too intoxicated to consent." *Id.*

Findings of guilty may be based on direct or circumstantial evidence. *Id.* at \*10–11 (citing Rule for Courts-Martial 918(c)). "[T]he absence of direct evidence of an element of an offense does not prevent a finding of guilty for that offense from being legally sufficient." *Id.* at \*11.

We have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances including the following factors: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted).

If we cannot determine that the sentence would have been at least of a certain magnitude, we must order a rehearing. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000).

**2. Analysis**

Appellant alleges first that his conviction for sexual assault without consent is legally and factually insufficient. Viewing the evidence through the lens provided in *Mendoza*, the evidence presented does not render the conviction for sexual assault factually sufficient.

We echo the CAAF's holding that a conviction may be found and sustained based on circumstantial evidence. Here, however, the circumstantial evidence presented, in light of the clarification of the theory of liability at issue, was not sufficient to sustain Appellant's conviction for sexual assault against KE.

The evidence leaves significant questions unanswered related to whether KE was capable of consenting. She testified that she drank multiple alcoholic drinks over the course of the evening. Appellant offered to give KE a "piggyback ride." KE, tired and drunk, agreed. The next thing KE remembered after

getting on Appellant's back is waking up in Appellant's room with Appellant inside of KE having sex with her. There was no evidence presented illuminating what actually occurred between these events. At trial, a forensic psychologist testified concerning the possibility of KE experiencing an alcohol "blackout" (*i.e.*, KE's level of alcohol consumption compromised her ability to form and retain memories of the evening, but did not compromise her ability to know and appreciate her surroundings and engage in voluntary behavior in relation to the charged sexual act). He also testified about the possibility of KE experiencing an alcohol "pass out" (*i.e.*, incapacitation by alcohol resulting in sleep, unconsciousness, or incapable of appraising the nature of the conduct at issue; or physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue, *see United States v. Pease*, 75 M.J. 180, 185 (C.A.A.F. 2016)). In the absence of evidence related to that time period, we are not convinced beyond a reasonable doubt that KE was, at the time of the sexual act, capable of consenting, but did not consent.

Appellant was not charged with sexual assault upon a person incapable of consenting, so we will not evaluate the legal or factually sufficiency of a conviction for that type of offense. Our role is to review the evidence and evaluate whether the evidence presented at trial constitutes proof of each of the charged offense's required elements beyond a reasonable doubt. *Wheeler*, 76 M.J. at 568. Here, applying neither a presumption of innocence nor a presumption of guilt in making our own independent determination, we find that the evidence does not convince us of Appellant's guilt of the charged sexual assault offense against KE beyond a reasonable doubt.

Having found this conviction factually insufficient, we must decide whether we can reassess the sentence or remand the case to permit a rehearing on sentence. We find that we cannot reliably reassess the sentence in this case.

Evaluating the *Winckelmann* factors, Appellant chose and was sentenced by a military judge. Therefore, we have access to the military judge's adjudged confinement terms for each offense of which Appellant was convicted. However, the sexual assault conviction carried with it the mandatory minimum punishment of a dishonorable discharge. It is difficult to predict whether the military judge would have adjudged a dishonorable discharge, or even a bad-conduct discharge for the two remaining convictions. Certainly, he viewed them as significantly less severe in nature, having adjudged confinement terms of 1 month and 3 months for the other two offenses involving the other two victims, and 30 months for this offense. We routinely review cases similar to this one and have familiarity with this type of conduct and appropriate punishments commonly adjudged. That said, we are compelled to note that reversing Appellant's conviction for sexual assault dramatically changes the penalty landscape and exposure. We are not confident that Appellant's sentence would

be of a certain magnitude. Therefore, we cannot reassess the sentence but do permit a rehearing on sentence for the remaining offenses.

### III. CONCLUSION

The finding of guilty for Specification 2 of the Charge and the sentence are **SET ASIDE**. Specification 2 of the Charge is **DISMISSED WITH PREJUDICE**. The findings of guilty to Specifications 1 and 3 of the Charge and the Charge are correct in law and fact and are **AFFIRMED**. A rehearing as to the sentence is authorized. The record is returned to The Judge Advocate General for further proceedings consistent with this opinion. We will complete our Article 66, UCMJ, 10 U.S.C. § 866, review when the record is returned to the court.

WARREN, Judge (concurring in part and dissenting in part):

I concur with my distinguished colleagues as to the entirety of the majority opinion with the exception of the decision to remand Appellant's case for a re-sentencing hearing. I respectfully dissent from the decision to remand this case for re-sentencing. Instead, in exercising our broad discretion to reassess a sentence, I would reassess Appellant's sentence to include a bad-conduct discharge, four months' confinement, reduction to the grade of E-1, and a reprimand, because I am confident that even without the sexual assault conviction which we are compelled to set aside on appeal (given our superior court's recent decision in *United States v. Mendoza*, __ M.J. __, No. 23-0210, 2024 CAAF LEXIS 590 (C.A.A.F. 7 Oct. 2024)), that the military judge would have imposed a sentence of at least that severity at trial. *See United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013).

The majority correctly recites the *Winckelmann* standard, I simply part ways with them in evaluating the weight of the factors as applied in this case. First, as our superior court took pains to emphasize in *Winckelmann*, the four factors offered in that case are "illustrative, but not dispositive, points of analysis." 73 M.J. at 15. Second, in my eyes, while *Winckelmann* factor (1) bears in favor of Appellant (*i.e.*, a "dramatic change in the penalty landscape" by virtue of dismissal of the sexual assault conviction), the remaining three factors bear in favor of sentence reassessment. Applying those factors in turn: (2) this was a judge alone sentencing forum which, on balance, tends to lend itself to more consistency in accessing like types of cases, rendering our sentencing reassessment more reliable in terms of aligning it with what the military judge would have imposed at trial; (3) while the nature of the remaining abusive sexual contact offenses do not fully capture the gravamen of the original offenses which included a penetrative sexual assault offense, the significant or

13

aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses; and (4) the remaining offenses are of the type that judges of the Courts of Criminal Appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial. *Id.* at 15–16 (citations omitted).

In particular, I find that factors (3) and (4) augur most strongly for sentence reassessment here. Appellant repeatedly refused to take no for an answer in trying to kiss and grope IE against her will and attempting to force her unwilling hand to contact his erect penis. Moreover, the circumstances were aggravating as, far from apologetic, Appellant's immediate response to IE's resistance to his unwanted advances was to affect the aggrieved complaint that "[she] can't just leave [him] like this [*i.e.*, sexually aroused]." Those aggravating circumstances are all the more significant because they were absent from the sexual assault conviction against KE (which we set aside on appeal). There, Appellant communicated some dismay (if not remorse) when KE testified she "pretended to be asleep" so that Appellant would stop penetrating her. He said "oh no" and stopped—appearing to indicate at least a subjective (if not objectively reasonable) mistake of fact as to consent. By contrast, he was unrepentant in the face of IE's resistance to his unwanted advances. In short: the primary aggravating circumstances of the trial would still have been available to the military judge even absent the sexual assault conviction. In my view, that evidence is highly persuasive in our sentence reassessment analysis. *Cf. United States v. Gogas*, 58 M.J. 96, 99 (C.A.A.F. 2003) (holding that an accused's indifference to the nature or consequences of criminal conduct is an aggravating factor); *United States v. Alis*, 47 M.J. 817, 826 (A.F. Ct. Crim. App. 1998) (citation omitted) (holding that an accused's attitude toward the offense of which he has been convicted is directly related to that offense and relevant to fashioning a sentence).

To me, the only real question with regard to sentence reassessment in this case is whether we as a court can be confident that the military judge below would have imposed a punitive discharge for the abusive sexual contact offenses, standing alone. We can. Considering the nature of those offenses (as recited above) and evaluating all the sentencing evidence admitted at trial as part of the totality of the circumstances, I find no difficulty in reaching the conclusion that the military judge would still have imposed a punitive discharge here, notwithstanding the fact that, unlike a penetrative sexual assault offense, a punitive discharge was not mandatory for the abusive sexual contact offenses. First, a bad-conduct discharge is an authorized punishment for abusive sexual contact. *Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶60.d.(4). Second, Rule for Courts-Martial 1003(b)(8)(C) explains that a bad-conduct discharge is "a punishment for bad conduct rather than [ ] a punishment for serious offenses of either a civilian or military nature." Third, while

14

the military judge imposed only four months of total confinement for those specifications, to me, that does not undermine my confidence that the military judge would have imposed a bad-conduct discharge. Of course a bad-conduct discharge could be imposed even absent any adjudged confinement. Moreover, the relative moderation of the military judge's four months of adjudged confinement for the abusive sexual contact offenses is easily explained as simply a determination that the more superficial nature of the touchings involved there warranted less confinement as a matter of necessary specific deterrence to Appellant from replicating that conduct in the future—not that this conduct did not warrant a punitive discharge. *See United States v. Moore*, No. ACM 40423, 2024 CCA LEXIS 181, at *9 (A.F. Ct. Crim. App. 8 May 2024) (unpub. op.) (holding that Appellant's sentence to 10 days' confinement and a punitive discharge for abusive sexual contact was not inappropriately severe because "[d]ifferent punishments . . . accomplish different purposes. It is reasonable for a sentencing authority to view confinement primarily as a tool of specific deterrence to prevent future misconduct and preserve public safety, while separately viewing a punitive discharge as a tool designed to appropriately characterize an accused's service . . .") (citations omitted)).

For all these reasons, I think we are well positioned to reassess Appellant's sentence. Accordingly, I respectfully dissent from the majority's decision to remand for re-sentencing.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court